**James D. KNIGHT, et al., Appellants,**

v.

**The SHOSHONE AND ARAPAHOE INDIAN TRIBES of the WIND RIVER RESERVATION, WYOMING, Appellees.**

No. 80–1810.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Nov. 16, 1981.

Decided Feb. 8, 1982.

---

Bradley L. Booke, Lander, Wyo., for appellants.

Harry R. Sachse and William R. Perry of Sonosky, Chambers & Sachse and R. Anthony Rogers and Susan O. Berghoef of Wilkinson, Cragun & Barker, Washington, D. C., for appellees.

BREITENSTEIN, Circuit Judge.

This appeal questions the validity and applicability of a tribal zoning ordinance adopted by the Shoshone and Arapahoe Indian Tribes and affecting fee lands owned by non-Indians and located within an Indian Reservation. The district court ordered a partial summary judgment and a preliminary injunction requiring compliance with the zoning ordinance. District court jurisdiction is based on 28 U.S.C. § 1362 and appellate jurisdiction on 28 U.S.C. § 1292(a). We affirm.

A stipulation of the parties covers all of the pertinent facts. An 1868 treaty, 15 Stat. 673, created the Wind River Reservation for the Shoshone Indians. Since the year of the treaty the Arapahoe Tribe has shared the Reservation with the Shoshones and has been accorded a right of joint occupancy. See *Shoshone Tribe v. United States*, 299 U.S. 476, 495, 57 S.Ct. 244, 250–51, 81 L.Ed. 360. The reservation contains some 2,300,000 acres in west-central Wyoming along the Big Wind River at the foot of the Wind River Mountains. Ownership of the land is divided among the Tribes, the United States in trust for Indians and individual Indians, and non-Indians. About 6,000 Indians live on the Reservation. The land involved in this case was originally acquired by non-Indians through purchases from Indian allottees.

In the summer of 1978 defendants-appellants James and Karen Knight, non-Indians and the then fee owners of the pertinent land, discussed with the local office of the Bureau of Indian Affairs, BIA, plans for the subdivision of their land. At that time no tribal ordinance governed land use control.

On November 15, 1978, the Arapahoe Business Council and the Shoshone Business Council, the governmental bodies for the Reservation, enacted Tribal Ordinance No. 38, a tribal zoning code. It expressly applies to:

> "[A]ll lands within the exterior boundaries of the Wind River Reservation, whether held in trust by the U. S. for the benefit of individual Indians, or for the Shoshone and Arapahoe Tribes, or held in fee by Indians or non-Indians."

The Tribes submitted the code to BIA which answered that the adoption of the code was within the authority of the Tribes and did not require BIA approval. The code was not recorded in Fremont County where the land is located, and was not published in the Federal Register.

By January, 1979, the Knights had prepared plats for a 32-lot subdivision to be called Big Wind Ranchettes No. 1 and a 100-lot subdivision to be called Big Wind Ranchettes No. 2. The plats were presented to the Fremont County Planning Commission which approved them subject to approval by the County Commissioners.

Approval by the County Commissioners was never obtained.

The Knights proceeded to plat, subdivide, and sell lots. By mid-November, 1979, 18 trailers and 4 houses had been placed on the lots and 11 wells dug.

In September, 1979, the Tribes brought this action against the Knights and their grantees to enjoin the development of the subdivision and to recover damages. Some of the defendants counterclaimed for money damages from the Tribes. Others cross-claimed against the Knights alleging fraud and other charges. The State of Wyoming intervened as a defendant. The court granted a preliminary injunction. The parties entered into a comprehensive stipulation of the facts and filed cross-motions for summary judgment. The issues presented to the court were whether the Tribes had legal authority to regulate the use of non-Indian owned, fee patented lands located within the exterior boundaries of the Reservation and whether, if the power existed, the zoning code was a valid exercise of that power. The court answered each question in the affirmative, and continued the preliminary injunction with the requirement that the defendants were given time in which to apply to the Tribe for approval of the subdivision and the Tribes should promptly act on any application. The court's order contained detailed findings of fact and a lengthy discussion of the law. All defendants, except the State of Wyoming, filed a joint notice of appeal. Section 1292(a), 28 U.S.C., gives appellate jurisdiction to review the injunction. After the case was docketed in the Court of Appeals, the motion of several of the defendants to dismiss the appeal as to them was granted. Only the Knights, the Developers, have filed a brief in the Court of Appeals.

■ The district court held, and we agree, that the case presents no jurisdictional problem. The action was brought by Indian Tribes duly recognized by the Secretary of the Interior to enforce a right which they claim under the Constitution, laws, and treaties of the United States. See 28 U.S.C. § 1362. The Tribes allege and show that they have no adequate remedy at law and will suffer irreparable injury unless the requested relief is granted.

■ The Developers argue that the Tribes have no authority to control the use of fee lands by non-Indians without a delegation by Congress of such power. We disagree. Indian Tribes have "attributes of sovereignty over both their members and their territory." *Merrion v. Jicarilla Apache Tribe*, —— U.S. ——, ——, 102 S.Ct. 894, 903, 71 L.Ed.2d 21, 42 CCH S.Ct. p. 1121, 1129, citing *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 718, 42 L.Ed.2d 706. Included in the Tribal power is "a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest." *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152–153, 100 S.Ct. 2069, 2080–81, 65 L.Ed.2d 10. Civil jurisdiction is distinguishable from the criminal jurisdiction over non-Indians which was denied in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 212, 98 S.Ct. 1011, 1022, 55 L.Ed.2d 209.

■ In the situation presented no treaty provision is of any pertinence and Congress has not acted to delegate or deny the right to control use of non-Indian owned land located within the reservation. Denial of the right does not arise by implication as a necessary result of their [the Tribes] dependent status. See *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303; *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 1245, recognizes that: "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." One proper form of the exercise of that power may be in response to "conduct [which] threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id.

Art. 1 of the Tribal zoning code sets out its purpose thus:

"Uncontrolled use and development of land within the Wind River Reservation *poses a threat to the use of the Reservation as a homeland for the Shoshone and Arapahoe Tribes for whom the Reservation was established and jeopardizes the value of the land and water, impairs the economic benefits of the natural resources and damages the environment.* All residents of the Reservation are affected. To protect the interests of the Tribes and all persons on the Reservation this Code is adopted." [Emphasis supplied.]

The subdivision proposed by the Developers is located in the 25 square mile Lower Arapahoe Area of the Reservation. About one-third of the land immediately adjacent to the subdivision is tribal land held in trust. The other two-thirds is about equally divided between land held in trust for individual Indians, and fee land largely owned by non-Indians. The trial court found that the Tribes have a significant and substantial interest in the area. It includes grounds where traditional tribal ceremonies are held annually. Two major pow wows are held annually within five miles of the subdivision. Within the same distance are two predominantly Indian schools, two Indian cemeteries, and an Indian activity hall. The subdivision is within an Indian reclamation project and the developers have made seven unauthorized ditch crossings. Within the Lower Arapahoe Area are 241 Indian-occupied dwellings housing 1,345 people and 110 non-Indian occupied dwellings.

The City of Riverton, located across the river from the Lower Arapahoe Area, claims no authority over that area and the Indians claim no authority over Riverton. The record does not show that either the State of Wyoming or any of its political subdivisions have exercised the power of land use control within the exterior boundaries of the Reservation.

■■ The absence of any land use control over lands within the Reservation and the interest of the Tribes in preserving and protecting their homeland from exploitation justifies the zoning code. The fact that the code applies to and affects non-Indians who cannot participate in tribal government is immaterial. See *United States v. Mazurie*, 419 U.S. 544, 557–558, 95 S.Ct. 710, 717–18, 42 L.Ed.2d 706, and *Williams v. Lee*, 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251. The activities of the Developers directly affect Tribal and allotted lands.

■ The executive branch expressly advised the Tribes that the ordinance could be enacted without BIA approval. Similarly, in 1900 the United States Attorney General advised the Secretary of Interior that certain tribes there considered could "prescribe the terms . . . upon which they will permit outsiders to reside or carry on business in their territory." 23 Op.Atty.Gen. 214, 216 (1900). See also opinion of Solicitor of the U. S. Interior Department quoted in *Merrion v. Jicarilla Apache Tribe*, —— U.S. at ——, n. 12, 102 S.Ct. at 906, n. 12, 42 CCH S.Ct. Bull., p. 1134, n. 12. The power to control use of non-Indian owned land located within the reservation flows from the inherent sovereign rights of self-government and territorial management. See *Merrion v. Jicarilla*, Id. —— U.S. at ——, ——, 102 S.Ct. at 894, 901, at pp. 1121, 1125. The express positions of the executive and judicial branches and the implication fairly to be drawn from the lack of delegation or denial of this power by Congress, support the conclusion that the Tribes had the power to enact the zoning ordinance in question.

■■ The Developers contend that the zoning ordinance is invalid because of the lack of legitimate objectives and the absence of a comprehensive plan. We agree with the trial court that the ordinance relates substantially to the general welfare of those living on the Reservation and reflects the Tribes' concern over the perceived threat to the rural character of the Reservation and the lifestyle of a majority of those living on the Reservation. A governmental purpose to protect residents from the ill effects of urbanization has long been recognized as a legitimate use of the police power. *Agins v. Tiburon*, 447 U.S. 255, 261,

100 S.Ct. 2138, 2142, 65 L.Ed.2d 106. The mere enactment of the ordinance is not an unconstitutional taking. Id. at 260, 100 S.Ct. at 2141. The ordinance substantially advances Tribal goals. The preliminary injunction of the district court gave the defendants time to make application to the Tribes for approval of their subdivision and required the Tribes to act promptly.

After the grant of partial summary judgment and continuation of the preliminary injunction, the Tribes presented to the court a written report saying that they had disapproved any subdivision in Wind River Ranchettes No. 2 where no substantial development had occurred but had approved one sale of ten acres and improvements thereon. On Ranchette No. 1, the Tribes approved the subdivision subject to specified conditions. The tribal rulings are in the record. The record shows no attack on, or objections to, the rulings. When and if specific attacks are made on the application and enforcement of the zoning ordinance, they can then be considered.

The grant of the preliminary injunction is affirmed.