**Lavonne RED FOX, Plaintiff and Appellant,**

v.

**Ronald HETTICH, and Northwest G.F. Mutual, Defendants and Appellees.**

**No. 17509.**

Supreme Court of South Dakota.

Argued Jan. 13, 1992.

Reassigned July 7, 1992.

Decided Jan. 13, 1993.

**640**

B.J. Jones, Dakota Plains Legal Services, Fort Yates, for plaintiff and appellant.

Daniel Todd of Bormann, Buckmeier, Bauer & Todd, Mobridge, for defendants and appellees.

Mark Barnett, Atty. Gen., John P. Guhin, Deputy Atty. Gen., Pierre, for amicus curiae State of S.D.

MILLER, Chief Justice (on reassignment).

LaVonne Red Fox (Red Fox) appeals from an order of the circuit court which granted summary judgment to Ronald Hettich (Hettich) and Northwest G.F. Mutual Insurance (Northwest), Hettich's homeowner's insurance carrier. We affirm.

## FACTS

Red Fox is an enrolled member of the Standing Rock Sioux Tribe who, at the time this action was commenced in circuit court, resided in Fort Yates, North Dakota, which is within the exterior boundaries of the Standing Rock Sioux Indian Reservation. This reservation extends from North Dakota into South Dakota. Hettich is a non-Indian who, at the time this action was commenced, resided and operated a business in McLaughlin, South Dakota,[1] which is within the exterior boundaries of the Standing Rock Sioux Indian Reservation. In the past he has utilized the Standing Rock Sioux Tribal Court to collect judgments from tribal members.

On the night of September 24, 1988, Red Fox was operating a motor vehicle on State Highway 63 in Corson County, South Dakota, which county lies entirely within the Standing Rock Sioux Indian Reservation. She struck a dead horse, owned by Hettich, which was on the highway. A few days later, Red Fox filed a civil complaint in the Standing Rock Sioux Tribal Court in Fort Yates, alleging that her vehicle was damaged as a result of Hettich's negligence. On September 28, Hettich was served by certified mail with the summons and complaint as well as a notice of hearing set for October 21.

Hettich did not appear at the hearing in tribal court. At that hearing, the tribal court heard testimony from Red Fox and the officer who investigated the accident. Thereafter, findings of fact and conclusions of law were entered, as was a default judgment against Hettich which awarded Red Fox $1,780.86 for property damages. Notice of entry of judgment was filed and served on Hettich by regular mail on November 3. Hettich refused to satisfy the tribal court judgment and failed to comply with the tribal court's May 2, 1989, order to appear before it to disclose his assets.

Red Fox then commenced this action in circuit court against Hettich and Northwest seeking an order from the circuit court granting full faith and credit to the tribal court judgment or recognizing its judgment on the basis of comity. In addition, Red Fox sought to recover attorney's fees from Northwest, pursuant to SDCL 58–12–3, for its refusal to pay the judgment.

All parties moved for summary judgment. The circuit court heard argument on November 26, 1990, and on March 12, 1991, entered an order which denied Red Fox' motion for summary judgment and granted summary judgment to Hettich and Northwest. The circuit court determined that (1) the tribal court had subject matter jurisdiction over the cause of action against Hettich; (2) the tribal court could not assert personal jurisdiction over Hettich; (3) the tribal court judgment was not entitled to recognition either under full faith and credit or comity principles; and (4) Red Fox had no bad faith claim against Northwest.

---

1. The population of McLaughlin is mostly non-Indian and the town is surrounded mostly by fee land owned by non-Indians.

Red Fox appeals, claiming the circuit court erred (1) in concluding the tribal court's judgment was not entitled to comity because it did not have personal jurisdiction over Hettich and (2) in failing to award attorney's fees. Because we decide the trial court properly concluded the tribal court judgment was not entitled to comity, we need not reach the question of attorney's fees.

## DECISION

### WHETHER THE TRIAL COURT ERRED IN REFUSING TO RECOGNIZE THE TRIBAL COURT ORDER UNDER THE PRINCIPLE OF COMITY.

We first examine the status of the parties and the location which gave rise to this civil action. Plaintiff, Red Fox, is an enrolled member of the Standing Rock Sioux Tribe. Defendant, Hettich, is a non-Indian. Red Fox resides on the North Dakota portion of the Standing Rock Sioux Indian Reservation; Hettich resides on fee land on the South Dakota portion. The claimed tort occurred within the exterior boundaries of the Standing Rock Sioux Indian Reservation.

A judgment was entered in tribal court which Red Fox asked the circuit court to recognize. The circuit court denied recognition of the tribal judgment. SDCL 1-1-25 guides our determination of whether the tribal court judgment may be recognized by the courts of South Dakota:

2. SDCL 1-1-25 was passed by the legislature following our decision in *Mexican v. Circle Bear*, 370 N.W.2d 737 (S.D.1985). The statute's requirements for the application of comity are more restrictive than we set out in *Circle Bear*. The terms and conditions of SDCL 1-1-25 continue:
 (b) The order or judgment was not fraudulently obtained;
 (c) The order or judgment was obtained by a process that assures the requisites of an impartial administration of justice including but not limited to due notice and a hearing;
 (d) The order or judgment complies with the laws, ordinances and regulations of the jurisdiction from which it was obtained; and
 (e) The order or judgment does not contravene the public policy of the state of South Dakota.
 (2) If a court is satisfied that all of the foregoing conditions exist, the court may recognize

No order or judgment of a tribal court in the state of South Dakota may be recognized as a matter of comity in the state courts of South Dakota, except under the following terms and conditions:

(1) Before a state court may consider recognizing a tribal court order or judgment the party seeking recognition shall establish by clear and convincing evidence that:

(a) The tribal court had jurisdiction over both the subject matter and the parties[.]

SDCL 1-1-25(1)(a).[2]

■ As a preliminary matter, this statute applies only to an "order or judgment of a tribal court in the state of South Dakota[.]" Interestingly enough, it is Red Fox who claims that the Standing Rock Sioux Tribal Court is not a tribal court of South Dakota because its headquarters is in Fort Yates, North Dakota. Therefore, she asserts that we must recognize the tribal court judgment under the principles of full faith and credit.[3] However, the Standing Rock Sioux Tribal Court exercises its jurisdiction throughout the Standing Rock Reservation, including that substantial portion which lies within South Dakota. Thus, we believe the Standing Rock Sioux Tribal Court is "a tribal court in the state of South Dakota" within the meaning of SDCL 1-1-25 and that this case is governed by SDCL 1-1-25. We now turn to

the tribal court order or judgment in any of the following circumstances:
 (a) In any child custody or domestic relations case; or
 (b) In any case in which the jurisdiction issuing the order or judgment also grants comity to orders and judgments of the South Dakota courts; or
 (c) In other cases if exceptional circumstances warrant it; or
 (d) Any order required or authorized to be recognized pursuant to 25 U.S.C. § 1911(d) or 25 U.S.C. § 1919.

3. 28 U.S.C. § 1738 (1988) requires states to give full faith and credit to judicial proceedings of other states, territories or possessions. We have not extended full faith and credit to tribal court judgments in the past, *Mexican v. Circle Bear*, 370 N.W.2d 737, 740 (S.D.1985), and are not compelled to do so now.

an examination of the statute's terms and conditions.

■ Red Fox must first clearly and convincingly establish that the tribal court had jurisdiction over both the subject matter and the parties. SDCL 1–1–25(1)(a); *Wells v. Wells,* 451 N.W.2d 402, 403 (S.D.1990); *In re Defender,* 435 N.W.2d 717, 720 (S.D. 1989); *State ex rel. Joseph v. Redwing,* 429 N.W.2d 49, 50 (S.D.1988) *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2071, 104 L.Ed.2d 636 (1989). *See also, Mexican v. Circle Bear,* 370 N.W.2d 737 (S.D.1985) (citing *Hilton v. Guyot,* 159 U.S. 113, 202–03, 16 S.Ct. 139, 158, 40 L.Ed. 95, 122 (1895)). We review jurisdictional challenges de novo. *State v. Spotted Horse,* 462 N.W.2d 463, 465 (S.D. 1990) *cert. denied,* ── U.S. ──, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

## TRIBAL JUDICIAL JURISDICTION

■ Before a tribal court may adjudicate a matter, Professor Frank Pommersheim notes: "First, the tribal court has to determine whether it possesses judicial jurisdiction over the suit. And second, the court must resolve whether the tribe has the legislative authority to regulate the conduct of non-Indians engaged in the activities at issue." F. Pommersheim, *The Crucible of Sovereignty: Analyzing Issues of Tribal Jurisdiction,* 31 Ariz. L.Rev. 329, 335 (1989) (hereinafter Pommersheim) (citing *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 12, 107 S.Ct. 971, 974, 94 L.Ed.2d 10, 17 (1987)). *See National Farmers Union Ins. Co. v. Crow Tribe of Indians,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985).

We agree with Professor Pommersheim's general thesis that tribal judicial jurisdiction depends on "whether the tribal court has proper subject matter, personal, and territorial jurisdiction...." *Pommer-*

*sheim, supra* at 336. These issues are resolved by determining whether federal law limits the tribal court's authority and whether tribal law has empowered the tribal court to hear the case. *Id.* at 334. Unless the determination has been made that the tribal court has judicial jurisdiction, we need not resolve whether the tribe has legislative authority to regulate Hettich's conduct pursuant to *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Both must be found before SDCL 1–1–25(1)(a) is satisfied, for without legislative authority to regulate Hettich's conduct, the tribal court will have no case which it can adjudicate.[4]

SDCL 1–1–25, requires us to analyze jurisdictional issues through its traditional components of subject matter and personal jurisdiction. This is not unreasonable in light of the fact that we engage in such an analysis before recognizing other foreign judgments, *Baldwin v. Heinold Commodities, Inc.,* 363 N.W.2d 191, 194 (S.D.1985); *Bahr v. Bahr,* 85 S.D. 240, 244, 180 N.W.2d 465, 467 (1970); *see also* SDCL 15–16A–1 to 10 (Uniform Enforcement of Foreign Judgments Act), as do federal courts. *Nevada v. Hall,* 440 U.S. 410, 421, 99 S.Ct. 1182, 1188, 59 L.Ed.2d 416, 425 (1979); *Kulko v. California Super. Ct.,* 436 U.S. 84, 96, 98 S.Ct. 1690, 1702, 56 L.Ed.2d 132, 143 (1978). However, a review of the cases of the United States Supreme Court reveals that the analysis of jurisdictional issues between Indian and federal or state governments is rarely broken down into the traditional facets of subject matter and personal jurisdiction. Rather, the United States Supreme Court refers to criminal or civil jurisdiction. *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). *Montana,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493, and cases decided since, refer

---

**4.** This method of analysis may be summarized mathematically:

A tribal court's adjudicative authority = judicial jurisdiction + legislative jurisdiction. This is further broken down:

Judicial jurisdiction = territorial jurisdiction + subject matter jurisdiction + personal jurisdiction. Legislative jurisdiction = *Montana's* regulatory authority.

Therefore: (A tribal court's adjudicative authority) = (territorial jurisdiction + subject matter jurisdiction + personal jurisdiction) + (*Montana's* regulatory authority).

The import of this formula is that if any part is missing, regardless of what else exists, it still equals something less than a tribal court's adjudicative authority.

to regulatory jurisdiction. But is this a facet of subject matter jurisdiction? Of personal jurisdiction? It is unclear. It appears from our reading of the cases, that it is neither and both. While recognizing Indian tribes occupy a unique position in the United States, we also recognize that this failure to analyze questions of tribal jurisdiction through. jurisdiction's traditional component parts does not promote clarity of jurisdictional analysis.

We take the opportunity presented by this case to begin to clarify our method of jurisdictional analysis for the recognition of tribal court judgments. SDCL 1–1–25 does not directly address a criminal/civil breakdown of jurisdiction. Nor does it directly address a territorial or a legislative breakdown of jurisdiction. Nevertheless, we must make the initial determination of whether the action is civil or criminal. Once that determination is made, we look to territorial jurisdiction which is implicit in jurisdictional analysis. We then engage in our statute's traditional subject matter and personal jurisdiction analysis. We conclude with *Montana's* legislative analysis which will confirm or negate subject matter and personal jurisdiction, without actually being a facet of either.

The method we engage in today will help to better mesh South Dakota's comity statute and its traditional subject matter/personal jurisdictional analytic requirements, with the United States Supreme Court's civil/criminal/legislative jurisdictional analytic requirements.[5]

## A. TERRITORIAL JURISDICTION

■ Having previously determined that this is a civil action, we now look to wheth-er the territorial jurisdiction component of tribal judicial jurisdiction is satisfied. Although territorial jurisdiction is not directly addressed by the statute, it is a necessary predicate to the determination of subject matter and personal jurisdiction. This civil action arose out of an incident which occurred within the boundaries of the Standing Rock Sioux Indian Reservation[6] on State Highway 63. The landowners adjacent to this highway, who owned their land in fee, had previously granted easements to the state for its construction. Nevertheless, this incident occurred within the boundaries of the reservation and is in Indian country.[7] We conclude therefore, that the territorial jurisdiction component of the Standing Rock Sioux Tribal Court's judicial jurisdiction has been met.

## B. SUBJECT MATTER JURISDICTION

Subject matter jurisdiction relates to the power of a court to hear and determine a general class of cases to which a particular proceeding belongs.

*Leon v. Numkena,* 142 Ariz. 307, 689 P.2d 566, 568 (1984) (citations omitted). *See also Harris v. Young,* 473 N.W.2d 141, 143–44 (S.D.1991); *In re Guardianship of Flyinghorse,* 456 N.W.2d 567, 568 (S.D. 1990); *Redwing,* 429 N.W.2d at 51.

A court's jurisdiction of the subject matter ... exists when a constitution or statute specifically confers upon the court such jurisdiction. *Timmerman v. Timmerman,* 163 Neb. 704, 81 N.W.2d 135 (1957). This power is likewise conferred upon Indian courts by their constitutions

5. We have no occasion today to address criminal jurisdictional analysis and express no opinion in that area.

6. A significant portion of the history of this reservation is set out in *Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), and *State v. Janis,* 317 N.W.2d 133 (S.D.1982).

7. "Indian Country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation[.]" 18 U.S.C. § 1151 (1988). This sec-tion generally applies to questions of civil jurisdiction as well as to questions of criminal jurisdiction. *DeCoteau v. District County Court,* 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 1084 n. 2, 43 L.Ed.2d 300, 304 n. 2 (1975); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 177–78 n. 17, 93 S.Ct. 1257, 1265 n. 17, 36 L.Ed.2d 129, 139 n. 17 (1973); *Kennerly v. District Court of Montana,* 400 U.S. 423, 424 n. 1, 91 S.Ct. 480, 481 n. 1, 27 L.Ed.2d 507, 509 n. 17 (1971); *Williams v. Lee,* 358 U.S. 217, 220–22 nn. 5, 6 & 10, 79 S.Ct. 269, 270–72 nn. 5, 6 & 10, 3 L.Ed.2d 251, 254–55 nn. 5, 6 & 10 (1959).

or tribal codes. *See generally* Cohen, *Federal Indian Law*, p. 428 (1958). *Leon*, 689 P.2d at 568.

■ The circuit court concluded the tribal court had subject matter jurisdiction over this cause of action. Despite the circuit court's invitation to do so, Hettich did not formally appeal by way of notice of review. Normally, when an appellee fails to file a notice of review pursuant to SDCL 15–26A–22 (1992 Supp), the trial court's conclusion of law becomes the law of the case and there is nothing for this court to review. *See Rude Transp. Co. v. P.U.C.*, 431 N.W.2d 160, 162 (S.D.1988); *State v. Howell*, 354 N.W.2d 196, 198 (S.D.1984); *In re Application of Northwestern Bell Telephone Co.*, 326 N.W.2d 100, 104 (S.D.1982); *Gridley v. Engelhart*, 322 N.W.2d 3, 5–6 (S.D.1982).

■ Nevertheless, both parties (and State, who filed an amicus brief) set out extensive arguments in their briefs regarding subject matter jurisdiction. In addition, Red Fox included in the docketing statement the issue of whether the tribal court judgment is entitled to comity. This issue necessarily includes the issue of subject matter jurisdiction. *See* SDCL 1-1-25. Further, the issue of subject matter jurisdiction in this case is of utmost importance to the state and the tribes. Thus, we will address it. *See State Hwy. Comm'n v. Beets*, 88 S.D. 536, 539–40, 224 N.W.2d 567, 568–69 (1974).

■ We first determine whether any federal statutes, decisional law or treaties control.[8] *Pommersheim, supra* at 336. "Interestingly enough, there are no federal statutes or decisions that categorically bar tribal court jurisdiction over certain civil matters. Because of the general absence of federal statutes that deal with the allocation of civil jurisdiction, few civil cases will be disposed of at this stage of analysis." *Id.* at 337. Similarly, we find no federal statutes, decisional law, or treaties which categorically limit this tribal court's civil judicial jurisdiction through limits on subject matter, personal or territorial jurisdiction. Nor do we find any federal statutes or treaties which categorically grant this tribal court civil judicial jurisdiction. Absent specific treaty provisions or federal statutes which categorically bar or grant the Standing Rock Sioux Tribal Court civil judicial jurisdiction, "[c]ivil jurisdiction over [activities of non-Indians on reservation lands] presumptively lies in the tribal courts[.]" *Iowa Mutual*, 480 U.S. at 18, 107 S.Ct. at 977, 94 L.Ed.2d at 21; *Sage v. Sicangu Oyate Ho, Inc.*, 473 N.W.2d 480, 482 (S.D.1991); *Defender*, 435 N.W.2d at 722.

■ We now look to determine whether Red Fox has clearly and convincingly established that the tribal court has civil subject matter jurisdiction as a matter of tribal law. Tribal law includes treaties, the tribal constitution, code, decisional law and custom. *Pommersheim, supra* at 337. The Standing Rock Sioux Tribal Code provides:

> 1–107. *Civil jurisdiction of the Standing Rock Sioux Tribal Court.*
>
> The judicial power shall extend to all cases in law and equity arising under the Tribal Constitution, the customs or the laws of the Tribe, and to any case in which the Tribe, a member of the Tribe, an Indian residing on the Reservation or a corporation or entity owned in whole or insubstantial part by any Indian shall be a party.

The tribal code clearly allows civil subject matter jurisdiction, as Red Fox, an enrolled member of the tribe, is a party to this civil action.

## C. PERSONAL JURISDICTION

Tribal judicial jurisdiction also depends on whether the tribal court has personal jurisdiction over the defendant. The Standing Rock Sioux Tribal Code does not appear to limit jurisdiction to any great extent and clearly grants the Standing Rock Sioux Tribal Court personal jurisdiction over Red Fox. It is, however, silent on whether the

---

**8.** *See, e.g.,* General Crimes Act, 18 U.S.C. § 1152 (1988); Major Crimes Act, 18 U.S.C. § 1153 (1988); Public Law 280, 18 U.S.C. § 1162 (1988), 25 U.S.C. §§ 1321–1326 (1988), 28 U.S.C. § 1360 (1988); Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963 (1988).

tribal court has personal jurisdiction over a non-Indian defendant who resides within the exterior boundaries of the reservation.

■ Some tribal codes contain "long-arm statutes" similar to those found in state and federal law to obtain personal jurisdiction over non-tribal members. *See*, Law and Order Code of the Shoshone and Arapaho Tribes of the Wind River Indian Reservation, Wyoming Tit. I, § 1–2–3; Law and Order Code for the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah ch. 2, § 1–2–3. The Standing Rock Sioux Tribal Code, however, contains no "long-arm" provision. Nevertheless, we agree with Professor Pommersheim's suggestion that absent a tribal code provision, a tribal court could apply traditional federal long-arm jurisdictional analysis. *Pommersheim, supra* at 341. *See, e.g.,* Rosebud Hous. Auth. v. LaCreek Elec. Coop., 13 Indian L.Rep. 6030 (Rosebud Sx.Tr.Ct.1986). Therefore, applying traditional long-arm analysis, before the tribal court can assert jurisdiction over a non-Indian, he must receive notice and have "minimum contacts" with the tribe. *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

■ We have previously said that the same due process standards which govern state court assertions of jurisdiction over nonresident defendants apply to tribal courts. *Defender,* 435 N.W.2d at 720 n. 2. Hettich was served notice of the tribal court proceeding via certified mail. This type of service is permitted by the Standing Rock Sioux Tribal Code, 2–102(4)(b)(4) and under the Federal Rules of Civil Procedure. Fed.R.Civ.P. 4(c)(2)(C)(ii) & (D). *Cf. Wells,* 451 N.W.2d at 403–04. Hettich acknowledged in his answer that he received notice of the claim. We conclude the reasonable notice requirement was met.

■ We next look to determine whether Red Fox has clearly and convincingly established that Hettich has the requisite "minimum contacts" with the Standing Rock Sioux Indian Reservation to enable this tribal court to assert jurisdiction over Hettich. More in the way of "minimum contacts" is required for a tribal court to exercise long-arm jurisdiction over a non-Indian "than would be sufficient for the citizen of one state to assert personal jurisdiction over the citizen of another state." *Babbitt Ford, Inc. v. Navajo Indian Tribe,* 519 F.Supp. 418, 431 (Ariz.1981) *aff'd in part, rev. in part on different grounds,* 710 F.2d 587 (9th Cir.1983), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984); *Swift Transp., Inc. v. John,* 546 F.Supp. 1185, 1193 (Ariz.1982), *vacated as moot,* 574 F.Supp. 710 (Ariz.1983). *See, e.g., World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

■ Hettich owns land, fee in nature, within the exterior boundaries of the reservation. He also owns and operates a grocery store within the exterior boundaries of the reservation. He engages in commercial transactions with tribal members. He has utilized the Standing Rock Sioux Tribal Court system to sue tribal members. Hettich had sufficient minimum contacts with the tribe to justify the tribal court's assumption of personal jurisdiction over him. Accordingly, we conclude the Standing Rock Sioux Tribal Court had judicial jurisdiction.

Nevertheless, mere presence within reservation boundaries is not enough to confer adjudicatory power on a tribal court. *Montana,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493; *Babbitt,* 710 F.2d at 598. Unless the tribe has the authority to regulate the conduct of non-Indians on state highways, the tribal court will not have the authority to adjudicate this action. *Iowa Mutual,* 480 U.S. at 12, 107 S.Ct. at 974, 94 L.Ed.2d at 17; *Pommersheim, supra* at 334. If mere physical presence within reservation boundaries is enough to confer tribal court jurisdiction, then the distinctions between reservation lands owned by Indians and those owned by non-Indians, as set forth in *Montana* and *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation,* 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), are meaningless. Therefore, a determination of whether there is tribal authority over non-Indians and their property is the other facet of a

tribal court's civil jurisdiction in Indian country. *Pommersheim, supra* at 334. We now look to determine whether Red Fox has clearly and convincingly established that the tribal court has the authority to adjudicate this matter as a result of the tribe's authority to regulate the claimed conduct of Hettich.

### TRIBAL LEGISLATIVE JURISDICTION

 We again begin our inquiry with an examination of federal law. Tribal authority is inherent in the tribe's retained sovereignty; it does not arise by delegation from the federal government. *United States v. Wheeler*, 435 U.S. 313, 328, 98 S.Ct. 1079, 1088–89, 55 L.Ed.2d 303, 315–16 (1978). Nevertheless, Indian tribes are "no longer 'possessed of the full attributes of sovereignty[.]'" *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106, 113 (1978); *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258, 67 L.Ed.2d at 510; *Wheeler*, 435 U.S. at 322–23, 98 S.Ct. at 1086, 55 L.Ed.2d at 312 (1978). Tribal sovereignty is subject to limitation by specific Constitutional and treaty provisions, *Wheeler*, 435 U.S. at 323, 98 S.Ct. at 1086, 55 L.Ed.2d at 312, acts of Congress, *Id.; Santa Clara Pueblo*, 436 U.S. at 56, 72, 98 S.Ct. at 1675, 1684, 56 L.Ed.2d at 114, 124; *Oliphant*, 435 U.S. at 195, 98 S.Ct. at 1014, 55 L.Ed.2d at 213; *Lone Wolf v. Hitchcock*, 187 U.S. 553, 556, 23 S.Ct. 216, 217, 47 L.Ed. 299, 301 (1903); *Fredericks v. Mandel*, 650 F.2d 144 (8th Cir.1981); *Nebraska Pub. Power Dist. v. 100.95 Acres of Land*, 540 F.Supp. 592, 598 (Neb.1982); *Swift Transp.*, 546 F.Supp. at 1193; *State v. Vandermay*, 478 N.W.2d 289, 290 (S.D.1991); or by implication due to the tribe's dependent status. *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258, 67 L.Ed.2d at 510; *Wheeler*, 435 U.S. at 323, 98 S.Ct. at 1079, 1086, 55 L.Ed.2d at 303, 312; *Cardin v. De La Cruz*, 671 F.2d 363, 366 (9th Cir.) *cert. denied*, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). As a general rule, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258, 67 L.Ed.2d at 510.

*Montana*, discussing the extent of tribal civil regulatory authority over non-Indians, "established that the dependent status of Indian tribes has implicitly divested them of the power to regulate, *in general,* 'the conduct of non-members on land no longer owned by, or held in trust for the Tribe.'" *De La Cruz*, 671 F.2d at 366 (citing *Montana* and *Colville Confederated Tribe v. Walton*, 647 F.2d 42, 52 (9th Cir.1981)). *Montana* acknowledged that tribes retain some civil authority over non-Indians:

> But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes and so cannot survive without express congressional delegation.... [Thus,] the inherent sovereign powers of an Indian tribe do not extend to activities of nonmembers of the tribe. To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.

*Montana*, 450 U.S. at 564–65, 101 S.Ct. at 1258, 67 L.Ed.2d at 509–10 (citations omitted). *Montana* went on to note, without deciding, that a tribe may have other authority as well:

> A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Montana*, 450 U.S. at 566, 101 S.Ct. at 1258, 67 L.Ed.2d at 511 (citations omitted). In contrast to the determination of the judicial jurisdiction of a tribal court, "[t]he primary effect of *Montana* is to create a threshold presumption that tribes do not have legislative and regulatory jurisdiction

over non-Indians on fee lands within the reservation." *Pommersheim, supra* at 345.

■ We look first to determine whether Hettich was engaged in "consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258, 67 L.Ed.2d at 510. It is clear that neither Hettich's consensual relationship with the tribe, through his utilization of its courts, nor his relationship with its members, through the operation of his grocery store, gave rise to the tort involved in this case. We conclude, therefore, that it is not within the inherent sovereign powers of the Standing Rock Sioux Tribe to "regulate, through taxation, licensing, or other means," Hettich's claimed tortious conduct on State Highway 63.

We next look to determine whether Red Fox has clearly and convincingly established that Hettich's claimed conduct, allowing his horse to wander onto State Highway 63, within the reservation, "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare *of the tribe.*" *Id.* (Emphasis added.) While *Montana* dealt with a tribe's authority to regulate non-Indian fishing on reservation land owned in fee by nonmembers of the tribe, it can be used to determine the extent that a tribe may regulate the tortious conduct of non-Indians on non-Indian lands within the reservation boundaries.

It is apparent that Hettich's conduct had a direct effect on "the economic security, or the health or welfare" of Red Fox. However, the second test under *Montana* is concerned with the effect upon *the tribe,* not on the individual tribal member.[9] Red Fox argues that the health and welfare of

the tribe was affected because a tribal member's property was damaged and a tribal officer was required to investigate. While it may be argued that the tribe may be "indirectly" affected by Hettich's conduct, only by stretching the test set forth in *Montana* to extremes can it be said that Hettich's conduct "directly" affected the tribe.[10] The distinction between tribal interests and tribal member interests is reflected in the cases cited in *Montana,* as well as subsequent cases applying the test. *See Babbitt,* 710 F.2d 587 (tribe's interest in enforcing repossession statute); *De La Cruz,* 671 F.2d 363 (tribe's interest in enforcing building, health, and safety regulations); *Knight v. Shoshone & Arapahoe Indian Tribes,* 670 F.2d 900 (10th Cir.1982) (tribe's interest in enforcing zoning ordinance). Red Fox has not referred this court to any law of the Standing Rock Sioux Tribe which determines that conduct such as Hettich's claimed conduct has a direct effect on tribal interests. Red Fox has not clearly and convincingly established that the Standing Rock Sioux Tribe is directly affected by Hettich's claimed conduct. We conclude, therefore, that the state court acted properly when it did not recognize the tribal court judgment under the principles of comity because Red Fox has failed to establish clearly and convincingly that the tribal court had jurisdiction to consider Hettich's claimed conduct.[11]

Our decision today does not determine that the tribal court was without jurisdiction. Nor do we determine that the state of South Dakota has jurisdiction. Rather, we hold only that Red Fox has not met her burden of proof. This holding is consistent with *Montana's* general proposition that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258, 67 L.Ed.2d at

9. We are aware that federal legislation can confer individual rights on the individual tribal member. *See McClanahan,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129.

10. *But see* Sage v. Lodge Grass Sch. Dist., 13 Indian L.Rep. 6035 (Crow Ct.App.1986), which

found tribal interest were affected in the remand of *National Farmers Union* from the United States Supreme Court.

11. In light of this decision, we need not address the remaining terms and conditions of SDCL 1–1–25.

510.[12]

Affirmed.

AMUNDSON, J., concurs.

SABERS, J., concurs specially.

WUEST and HENDERSON, JJ., concur in part and dissent in part.

SABERS, Justice (concurring specially).

I write specially to attempt to simplify a complicated area of the law. The issue simply is whether the tribal court decision was entitled to comity under SDCL 1-1-25.* The answer turns on whether the tribal court had subject matter jurisdiction under SDCL 1-1-25.

I agree with the majority that the tribal court *did not* have subject matter jurisdiction because, under *Montana*, there is a "presumption that tribes do not have legislative and regulatory jurisdiction over non-Indians on fee lands within the reservation[s]," *Pommersheim, supra* at 345, and Hettich's conduct does not threaten or have any *direct* effect on the political integrity, the economic security, or the health or welfare of the tribe. *Montana*, 450 U.S. at 566, 101 S.Ct. at 1258–59, 67 L.Ed.2d at 511 (citations omitted). Under these facts, the tribal court's subject matter jurisdiction was limited to Red Fox, an enrolled member of the tribe, and never extended to Hettich, a non-Indian. *Montana*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493.

Therefore, Red Fox did not establish by clear and convincing evidence that the tribal court had jurisdiction over the subject matter of the action and the tribal court judgment was not entitled to recognition as a matter of comity. SDCL 1-1-25(1)(a). In this limited respect, the majority holding is simply too narrow. This state court case is over and done with and is *res judicata* unless appealed.

I would not reach the issue of "personal jurisdiction" because it simply is not neces-

sary once it is determined there is *no* subject matter jurisdiction with respect to Hettich, a non-Indian. If it is discussed, we should simply point out that the trial court was wrong in concluding *no* personal jurisdiction because, as the majority states, this type of service (certified mail) was permitted by the tribal code and reasonable notice was given and admitted. *Cf. Wells v. Wells*, 451 N.W.2d 402 (S.D.1990).

WUEST, Justice (concurring in part and dissenting in part).

The majority opinion is a plethora of words, but does not decide anything except "Red Fox has not met her burden of proof." Therefore, she loses. I believe she never had a chance—the trial court granted summary judgment against her for the wrong reason, holding the tribal court did not have personal jurisdiction over Hettich. I would reverse the circuit court's determination that the tribal court lacked personal jurisdiction over Hettich, remand to the circuit court the issue of the tribal court's subject matter jurisdiction and affirm the circuit court's finding Red Fox has no cause of action against Northwest.

## I. FAILURE TO RECOGNIZE TRIBAL COURT JUDGMENT UNDER PRINCIPLE OF COMITY.

It is "well settled" in South Dakota that tribal court orders should be recognized in state courts under the principle of comity. *Redwing*, 429 N.W.2d at 50 (citing *Circle Bear*, 370 N.W.2d 737). SDCL 1-1-25 (1991 Supp.) lists five requirements which must be satisfied before a state court can recognize a tribal court order or judgment. Before a tribal court judgment may be recognized as a matter of comity, among other things, the tribal court must have had "jurisdiction over both the subject matter and the parties." SDCL 1-1-25(1)(a); *See also Circle Bear*, 370 N.W.2d at 740

---

12. Our decision today does not leave Red Fox without a forum in which to press her claim. It is not clear from the record whether Red Fox can levy on the judgment or has other avenues available in the tribal court to enforce her tribal court judgment. Nor does our decision pre-

clude her from bringing an action in state court against Hettich, similar to her original action in tribal court, assuming it is not barred by time or otherwise.

* SDCL 1-1-25 is set forth in full in majority opinion.

(citing *Hilton v. Guyot,* 159 U.S. 113, 202–03, 16 S.Ct. 139, 158, 40 L.Ed. 95, 122 (1894)); *In re Marriage of Red Fox,* 23 Or.App. 393, 542 P.2d 918, 921 (1975). Despite his residence within the external boundaries of the reservation, Hettich argued the tribal court had no personal jurisdiction over him. The circuit court determined it could not assert personal jurisdiction over Hettich although it had subject matter jurisdiction over the cause of action against him. The circuit court then concluded the tribal court judgment was not entitled to recognition either under full faith and credit or comity principles.

### A. *Personal Jurisdiction.*

Jurisdictional challenges are reviewed by this court de novo. *See Vandermay,* 478 N.W.2d at 290; *Spotted Horse,* 462 N.W.2d at 465. This court held in *Defender* that the same due process standard which governs state court assertions of jurisdiction over nonresident defendants applies to tribal courts. *Defender,* 435 N.W.2d at 720 n. 2. "Both components of due process—notice and minimum contacts—must be satisfied before a court may properly exercise personal jurisdiction over a party." *Id.* at 720 (citing *International Shoe,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95). The standard for determining whether the assertion of jurisdiction comports with due process was set forth by the United States Supreme Court as follows:

> The existence of personal jurisdiction … depends upon the presence of reasonable notice to the defendant that an action has been brought … and a sufficient connection between the defendant and the forum State to make it fair to require defense of the action in the forum.

*Id.* (quoting *Kulko,* 436 U.S. at 91, 98 S.Ct. at 1696, 56 L.Ed.2d at 141).

#### 1. Reasonable Notice.

"[N]otice [must be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Hettich was served notice of the tribal court proceeding via certified mail. This type of service is permitted by the Standing Rock Code, Title II, Section 102(b)(4) as it is under the Federal Rules of Civil Procedure. Fed.R.Civ.P. 4(c)(2)(C)(ii) & (D). *Cf. Wells,* 451 N.W.2d at 403–404 (notice by mail insufficient where tribal code required personal service). Hettich acknowledged in his answer that he received notice of the claim. Therefore the reasonable notice requirement was met.

#### 2. Minimum Contacts.

The "minimum contacts" standard has been most recently addressed by the United States Supreme Court in *Burnham v. Superior Court of California,* 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990). The *Burnham* Court held a California court could, consistent with due process, assert personal jurisdiction over a New Jersey resident who was served with process while visiting California for reasons unrelated to the suit. "Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a [s]tate have jurisdiction over nonresidents who are physically present in the [s]tate." *Id.* at 610, 110 S.Ct. at 2110, 109 L.Ed.2d at 639.

In the case before us, Hettich is a resident of McLaughlin within the exterior boundaries of the Standing Rock Sioux Indian Reservation. Thus, he was physically present within the reservation. It is beyond cavil that governments have personal jurisdiction over those who reside within their territory. *Pennoyer v. Neff,* 95 U.S. 714, 724, 24 L.Ed. 565, 569 (1877), *overruled on other grounds, Shaffer v. Heitner,* 433 U.S. 186, 212, 97 S.Ct. 2569, 2583, 53 L.Ed.2d 683, 702 (1977). *See also Burnham,* 495 U.S. at 611, 110 S.Ct. at 2110–11, 109 L.Ed.2d at 639–40.

I believe the tribal court could, consistent with due process, assert personal jurisdiction over Hettich. I would reverse the circuit court's determination that the tribal court lacked personal jurisdiction over Hettich.

B. *Subject Matter Jurisdiction.*

Based entirely upon *Rosebud*, in a very brief memorandum opinion, the circuit court concluded the tribal court had subject matter jurisdiction over the cause of action. *Rosebud Sioux Tribe v. State of S.D.*, 900 F.2d 1164 (8th Cir.1990). *Rosebud* purported to hold that South Dakota failed to validly assume criminal or civil jurisdiction over reservation highways. *Rosebud*, 900 F.2d at 1174. The precise issue before the court, however, was *whether the State had jurisdiction over Indians* on reservation highways. *Vandermay*, 478 N.W.2d at 290. Here, the court is concerned with *whether the tribal court had jurisdiction over a non-Indian.* Thus, *Rosebud* is inapposite.

In deciding whether a tribal court has subject matter jurisdiction, I agree with Professor Pommersheim that the first step in the analysis must be to decide whether federal Indian law prevents the tribal court from litigating a dispute between an Indian plaintiff and a non-Indian defendant where an alleged tort occurs in Indian country. *Pommersheim, supra* at 336. *Accord National Farmers Union*, 471 U.S. at 852, 105 S.Ct. at 2451–52, 85 L.Ed.2d at 824–25. "Indian tribes have long been recognized as sovereign entities, 'possessing attributes of sovereignty over both their members and their territory[.]'" *Babbitt Ford*, 710 F.2d at 591 (quoting *Wheeler*, 435 U.S. at 323, 98 S.Ct. at 1086, 55 L.Ed.2d at 312). *See also Circle Bear*, 370 N.W.2d at 740–41. Tribal authority is inherent in the tribe's retained sovereignty; it does not arise by delegation from the federal government. *Wheeler*, 435 U.S. at 328, 98 S.Ct. at 1088–89, 55 L.Ed.2d at 315; *Sanders v. Robinson*, 864 F.2d 630, 632 (9th Cir.1988), *cert. denied*, 490 U.S. 1110, 109

S.Ct. 3165, 104 L.Ed.2d 1028 (1989); *Circle Bear*, 370 N.W.2d at 740. "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence ... is that the sovereign power ... remains intact." *Iowa Mutual*, 480 U.S. at 18, 107 S.Ct. at 977–78, 94 L.Ed.2d at 21 (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 149 n. 14, 102 S.Ct. 894, 907 n. 14, 71 L.Ed.2d 21, 37 n. 14 (1982)).

"Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Iowa Mutual*, 480 U.S. at 18, 107 S.Ct. at 977, 94 L.Ed.2d at 21 (citations omitted) (holding Congress' passage of the diversity statute, 28 U.S.C. § 1332, did not impair tribal sovereignty). *Accord Blue Legs v. B.I.A.*, 867 F.2d 1094, 1097 (8th Cir.1989); *Sage v. Sicangu Oyate Ho*, 473 N.W.2d at 482.[1] Tribal sovereignty is not absolute, however. It is subject to limitation by specific treaty provisions, acts of Congress, application of the Constitution, or by implication due to the tribe's dependent status. *Babbitt Ford*, 710 F.2d at 591. Civil jurisdiction has not been restricted by Congress to the extent criminal jurisdiction has. *Iowa Mutual*, 480 U.S. at 15, 107 S.Ct. at 976, 94 L.Ed.2d at 19; *National Farmers Union*, 471 U.S. at 854–55 nn. 16 & 17, 105 S.Ct. at 2453, 85 L.Ed.2d at 826. However, "[t]he areas in which implicit divestiture of sovereignty has ... occurred are those involving the relations between an Indian tribe and non-members of the tribe." *National Farmers Union*, at 852 n. 14, 105 S.Ct. at 2452, 85 L.Ed.2d at 825 (quoting *Wheeler*, 435 U.S.

---

1. *See also White Mountain Apache Tribe v. Smith Plumbing Co.*, 856 F.2d 1301, 1305 (9th Cir.1988); *Wellman v. Chevron U.S.A., Inc.*, 815 F.2d 577, 578 (9th Cir.1987). Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians. *Santa Clara Pueblo*, 436 U.S. at 65, 98 S.Ct. at 1680, 56

L.Ed.2d at 119. The Ninth Circuit has relied on *Iowa Mutual* and *Santa Clara Pueblo* in conjunction with *Montana* (discussed *infra*) to hold a tribal court can exercise at least concurrent jurisdiction over a non-Indian husband who was a defendant in a divorce and custody proceeding where he, his wife, and all of the children resided on the reservation during the marriage. *Sanders*, 864 F.2d 630.

at 323–26, 98 S.Ct. at 1085–88, 55 L.Ed.2d at 312–15).

Thus, in *Montana,* the Supreme Court stated:

[The] exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.... [Thus,] inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. (citations omitted).[2]

*Montana,* 450 U.S. at 564–66, 101 S.Ct. at 1258, 67 L.Ed.2d at 509–11.

In *Brendale,* Justice White joined by three other justices in a plurality opinion stated, "[t]he inquiry ... becomes whether and to what extent the tribe has a protectable interest in what activities are taking place on fee land within the reservation and, if it has such an interest, how it may be protected." *Brendale,* 492 U.S. at 430, 109 S.Ct. at 3008, 106 L.Ed.2d at 363.

The concept of 'protectible interest' to which Justice White's opinion in the [*Brendale*] case referred, grew out of a long line of cases exploring the very narrow powers reserved to tribes over the

conduct of non-Indians within their reservations. *Even though a tribe's 'inherent sovereign powers ... do not extend to the activities of nonmembers, ...* [a] tribe may ... retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.' *County of Yakima v. Yakima Indian Nation,* —— U.S. ——, ——, 112 S.Ct. 683, 692, 116 L.Ed.2d 687, 703 (1992) (emphasis changed) (citations omitted).

I have found only two cases determining whether a tort committed by a non-Indian against an Indian on the reservation has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. Both cases held in the negative, although neither case has any precedential value here. *National Farmers Union Ins. Co. v. Crow Tribe of Indians,* 560 F.Supp. 213, 216–17 (D.Mont. 1983); *Swift,* 546 F.Supp. at 1193.

[T]he existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which the sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.

*National Farmers Union,* 471 U.S. at 855–56, 105 S.Ct. at 2453–54, 85 L.Ed.2d at 827. *Accord Blue Legs,* 867 F.2d at 1097–98. This examination should be conducted in the first instance in the tribal court itself. *Id. Accord Iowa Mutual,* 480 U.S. at 19, 107 S.Ct. at 978, 94 L.Ed.2d at 22. This court, of course, cannot remand to the tribal court to make this examination. Nor, given the current state of the record, can we make the determination of whether jurisdiction is proper. This case was dis-

---

**2.** I recognize the paradoxical nature of the discussion above. It results from the *Montana* Court having "strangely reversed the otherwise consistent presumption in favor of inherent tribal sovereignty over reservation lands...." *Brendale v. Confederated Tribes of the Yakima Nation,* 492 U.S. 408, 456–57, 109 S.Ct. 2994,

3021–22, 106 L.Ed.2d 343, 379–80 (1989) (Blackmun, J., concurring in part and dissenting in part) (*Montana* should be read to recognize "that tribes may regulate the on-reservation conduct of non-Indians whenever a significant tribal interest is threatened or directly effected.").

missed on a motion for summary judgment—a trial never took place. Therefore, each party should be given the opportunity to present evidence and authorities relative to subject matter jurisdiction.[3] Thus, I would remand to the circuit court to redetermine the issue of subject matter jurisdiction.[4] This important issue deserves careful consideration and analysis.

## II.

Northwest was not a party to the proceedings in tribal court. In the circuit court proceeding, Red Fox made Northwest a party, claiming attorney fees pursuant to SDCL 58-12-3 (1990) based on Northwest's refusal "to pay [the tribal court] judgment in violation of its policy covering ... Hettich." The circuit court ruled that Northwest was entitled to summary judgment as a matter of law on Red Fox's claim that Northwest's refusal to pay the tribal court judgment was "vexatious and without" reasonable cause. The court concluded a third party "does not have a right of action against an insurance carrier for bad faith."

SDCL 58-12-3 provides in pertinent part:

In all actions ... commenced against any ... insurance company ... *on any policy or certificate of any ... kind of insurance*, if it appears from the evidence that such company ... has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause the [court] shall, if judgment or an award is rendered for plaintiff, allow the plaintiff a reasonable sum as an attorney's fee....

(Emphasis added). Insurance is "a *contract* whereby one undertakes to indemnify another or to pay or provide a specified or determinable amount or benefit upon determinable contingencies[.]" SDCL 58-1-2(10) (1990) (emphasis supplied).

Red Fox relies on several South Dakota cases in her brief. However, those cases do not support her argument. Most of the cited cases involve suits by an insured against the insurer. One involves a garnishment action brought by a judgment creditor after the defendant failed to satisfy the judgment, *Bruins v. Anderson*, 73 S.D. 620, 47 N.W.2d 493 (1951).[5] One case cited by Red Fox is fatal to her claim.

In *Crabb v. National Indemnity Co.*, 87 S.D. 222, 205 N.W.2d 633, 63 A.L.R.3d 715 (1973), an insured assigned his claim against his insurance company for wrongful refusal to settle within policy limits to the plaintiff/judgment creditor. This court held the creditor could not recover attorney's fees via SDCL 58-12-3, reasoning the cause of action was "not an action against an insurance company on a policy of insurance within the contemplation of our statute." *Id.* 205 N.W.2d at 639. The court noted the gist of the action was tortious in nature, for wrongful refusal to settle within the policy limits of the insured, not contractual as contemplated by the statute. Here, Red Fox has not received an assignment of Hettich's cause of action, if Hettich ever had one. Thus, she cannot bring a cause of action against Northwest which is contractual in nature. I believe the circuit court was correct in concluding as a matter of law Red Fox could not recover attorney's fees via SDCL 58-12-3.

I would reverse the circuit court's determination that the tribal court lacked personal jurisdiction over Hettich, remand to the circuit court the issue of the tribal court's subject matter jurisdiction and affirm the circuit court's finding Red Fox has no cause of action against Northwest. In the event subject matter jurisdiction is found, the circuit court should determine

---

**3.** This case may eventually be decided by the United States Supreme Court. I believe it is imperative a complete record should be made for that eventuality.

**4.** I agree the second step of a court's analysis in determining whether a tribal court has subject matter jurisdiction involves an examination of whether the tribal court has jurisdiction as a matter of tribal law. *F. Pommersheim, supra*, at

337. The Standing Rock Code, Title I, § 107, provides for civil jurisdiction where a member of the Tribe is a party to the action.

**5.** Red Fox also relies on *Loy v. Bunderson*, 107 Wis.2d 400, 320 N.W.2d 175 (Wis.1982). That case involved a state statute which permitted a judgment creditor to sue an insurance company directly. SDCL 58-12-3 contains no such provision.

whether the other factors set out in SDCL 1–1–25 have been satisfied.

HENDERSON, Justice (concurring in part; dissenting in part).

I would reverse the order of the circuit court granting summary judgment to Hettich and would affirm that part of the circuit court's summary judgment which denied Red Fox's claim against Northwest G.F. Mutual Insurance.

Therefore, I concur in part and dissent in part to the majority opinion.

As I understand the posture of the majority opinion, there is territorial, subject matter and personal jurisdiction. However, Red Fox did not meet the burden of proof for establishing legislative jurisdiction; i.e., she did not pass the *Montana*[1] test as outlined in the majority.

Basically, I would hold that under the principles of comity, the North Dakota Tribal Court's judgment would be upheld. *Mexican v. Circle Bear*, 370 N.W.2d 737 (S.D.1985) ("We join with those Courts that have held that tribal court orders should be recognized in state courts under the principles of comity"); SDCL 1–1–25. I do not believe that the legal stance of Red Fox is proper under full faith and credit. Nearly one hundred years ago, the United States Supreme Court, when defining comity, stated:

> "Comity," in the legal sense, is neither a matter of absolute obligation on the one hand, nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95, 108 (1894); *Circle*

*Bear* at 740. This definition is recognized today. *Societe Nat. Ind. Aero. v. U.S. Dist. Court,* 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); *Guinness PLC v. Ward,* 955 F.2d 875 (4th Cir.1992). The guidelines for comity established by *Hilton*[2] are essentially the same as those found in SDCL 1–1–25, as cited in the majority writing.

Upon review, readers will note that the *Montana* test on legislative jurisdiction is not a part of either comity guidelines, nor does it need to be. In fact, comity is never addressed in *Montana*. Comity is not a rule of law, but one of practice, convenience, and expediency. *Vagenas v. Continental Gin Co.,* 789 F.Supp. 1137, 1140 (M.D.Ala.1992); *see generally Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971).

> Under the flexible principles that underlie the practice of comity, each state is permitted to establish its own set of rules for the recognition and enforcement of foreign judgments.

*Vagenas* at 1140. South Dakota's comity statute requires only subject matter and personal jurisdiction. SDCL 1–1–25. As the majority concedes, that much is established. Therefore, under our own comity statute, we should recognize the tribal court's ruling without any further review.

Nevertheless, the majority opts to apply the facets of *Montana*. Precisely, where I part company with the majority opinion is that it holds the conduct of Hettich had no direct effect on the economic security or the health or welfare of the tribe. Hettich lived on the reservation; he did business with the Indians and lived in their midst; he used the Tribal Court to collect money from Indians; he negligently ran horses within the boundary of the reservation so that horses, on occasion, were running up and down the highway; such type of conduct imperils the property and life of Indi-

---

**1.** *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

**2.** The *Hilton* conditions have been paraphrased as follows: (1) the foreign court actually had jurisdiction over both the subject matter and the parties; (2) the decree was not obtained fraudu-

lently; (3) the decree was rendered by a system of law reasonably assuring the requisites of an impartial administration of justice—due notice and a hearing; and (4) the judgment did not contravene the public policy of the jurisdiction in which it is relied upon. *Circle Bear* at 740.

ans who drive upon the highways; such conduct absolutely affects the health or welfare of all members of the Tribe, Red Fox being a member of the Tribe; the Standing Rock Sioux Tribe has reservation officers who must guard against such type of conduct and expend money in investigating accidents and trying to prevent such things as horses running up and down the highway creating danger. The Tribal Court entered Findings of Fact and Conclusions of Law concerning the negligence of Hettich. Outside the reservation, citizens wish to protect themselves from unwanted animals trespassing upon the highway; Indians have that same desire and privilege. Specifically, the trial court found that Hettich's horses were on this highway on other occasions and Hettich had failed to properly secure his corral, despite its close proximity to the highway.

Almost forty years ago, we held *"Defendants owed to plaintiff a duty to protect him against the hazard here involved if the danger should have been reasonably anticipated."* (Emphasis supplied mine). *Eixenberger v. Belle Fourche Livestock Exchange,* 75 S.D. 1, 58 N.W.2d 235 (1953). The "hazard here involved" referred to horses running freely on the highway. In 1953, this Court did not limit this case to the health and welfare of Edward M. Eixenberger. Nor should we limit today's holding to LaVonne Red Fox—the health and safety of all potential Standing Rock plaintiffs is at issue. Indians must travel up and down this highway to get to their homes, obtain groceries, go to the agency headquarters, attend church, see their friends.

Justice Wuest's minority opinion recognizes that there is personal jurisdiction but would remand to the trial court to determine if there is subject matter jurisdiction. In my opinion, there are enough facts developed to make a determination on subject matter jurisdiction. Therefore, I would not remand it to the circuit court. *See, Circle Bear, supra.*

*Circle Bear* was the bellwether of comity decisions as relates to Indians tribes in this state. In my special writing, to which I still subscribe, I expressed:

> I ascribe to the belief, in law, that there is a distinction between judicial comity and comity of nations. Comity is begotten from the womb of mutual respect and is not a child of obligation. We must live in mutual respect with our Indian brothers who serve on the trial courts of the various Indian reservations in South Dakota. They, in return, should likewise extend unto our courts reciprocating courtesy and respect.

*Id.* at 742. Here, we simply have to apply the facts of this case to our case law in South Dakota. This likewise applies to federal decisions.

"Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). *Circle Bear* at 741. As I understand it, the activities of non-Indians on reservation lands is an important part of tribal sovereignty. *Iowa Mutual Insurance Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). Thus, *jurisdiction* presumptively lies within the tribal courts, unless it is affirmatively limited by a specific treaty or federal statute. *Iowa Mutual,* 480 U.S. at 18, 107 S.Ct. at 977, 94 L.Ed.2d at 21.

In my dissent in *State ex rel. Joseph v. Redwing,* 429 N.W.2d 49, 52 (S.D.1988) and my concurrence in result in *Wells v. Wells,* 451 N.W.2d 402, 406 (S.D.1990), I quoted from *Iowa Mutual,* 480 U.S. at 9, 107 S.Ct. at 972, 94 L.Ed.2d at 15:

> Tribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development. Although the criminal jurisdiction of the tribal courts is subject to substantial federal limitation, *their civil jurisdiction is not similarly restricted.* If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a

matter of federal law. (Emphasis supplied mine).

*See, Burlington Northern Railroad Co. v. Blackfeet Tribe,* 924 F.2d 899 (9th Cir.1991) holding that rights of way granted to a railroad did not abrogate the right of an Indian tribe to tax the railroad.

Red Fox's rights to justice are caught up in a complicated jurisdictional struggle. She is trying to collect a $1,780.66 judgment. Due to the circuit court's ruling, she is without any forum to litigate her claim. As a citizen of this Republic, she is entitled to her day in court. Hettich's theory is one of duplicity and I want no part of it: On the one hand, he uses the tribal courts to collect bills and obtain judgments from his Indian customers; on the other hand, he advocates the tribal courts cannot be used against him. Law is supposed to be used to apply fairness to fundamental truths. It should not cause us to swerve from our good purpose and a highway of reality.